UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES HUGHES
*A/K/A* JAMIE HUGHES,

               Plaintiff,

                                       Case No. 13-cv-13806
                                       Honorable Gershwin A. Drain

v.

WILLIAM BEAUMONT HOSPITAL,

               Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#22] AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [#23]

**I.     INTRODUCTION**

On September 6, 2013, Plaintiff, James (also known as Jamie) Hughes ("Hughes"), filed the instant action, alleging that Defendant, William Beaumont Hospital ("WBH" or "Beaumont"), discriminated against her on account of her disability and gender identity. Plaintiff alleges six claims against WBH, including: (1) denial of a reasonable accommodation and discrimination under the Americans with Disabilities Act (the "ADA"); (2) denial of a reasonable accommodation and discrimination under Michigan Persons with Disabilities Civil Rights Act (the "PDCRA"); (3) gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"); (4) gender discrimination under the Michigan Elliott-Larsen Civil Rights Act (the "ELCRA"); (5) retaliation for assertion of rights under the PDCRA; and (6) retaliation for assertion of rights under the ELCRA.  Dkt. No. 1.

Presently before the Court are: (1) Defendant's Motion for Summary Judgment and (2) Plaintiff's Motion for Partial Summary Judgment.   Both of the Motions are fully briefed. Defendant's Motion for Summary Judgment was filed on July 21, 2014.   Dkt. No. 22. On September 4, 2014, Plaintiff filed a Response. Dkt No. 31. On September 18, 2014, Defendant filed a Reply. Dkt. No. 33.

On July 21, 2014, Plaintiff filed a Motion for Partial Summary Judgment.   Dkt. No. 23. On August 26, 2014, Defendant filed a Response.   Dkt. No. 26.   On September 5, 2014, Plaintiff filed a Reply.   Dkt. No. 32.

For the reasons that follow, the Court will DENY both Parties' Motions for Summary Judgment.

## II.   FACTUAL BACKGROUND

Plaintiff, Hughes, is a transgender individual. As a transgender individual, Hughes is biologically male but has the gender identity of a woman. She was diagnosed with a gender identity disorder, which is known in the medical community as gender dysphoria.   Gender dysphoria indicates a marked difference between an individual's express or experienced gender and the gender that others assigned to that individual, which lasts more than six months. Compl. at 2-3.   The condition includes distress about the incongruity between someone's birth gender and the gender with which the individual identifies as well as a desire to be the opposite gender. *Id.* at 3.   Since 1995, Hughes has undergone hormone replacement therapy and presents as a woman.  In addition, Hughes claims that she suffers from migraine headaches.

Hughes was an employee of Defendant, William Beaumont Hospital. Hughes began working for WBH in 1982. She worked for WBH for 30 years as an Inventory Control Clerk ("ICC").  As an ICC, Hughes' job duties included: maintaining adequate medical supply levels,

ordering and organizing medical supplies, coordinating timely supply distribution, and communicating with WBH staff to ensure proper medical supply replenishment. Def.'s Mot. Summ. J. 2. Plaintiff was supervised by Lou Goforth, the morning supervisor, and Terri Chapdelaine, the Assistant Director of Materials Management Operations.

The Beaumont Image and Appearance standards state: "Extreme hairstyles (including overly conspicuous or over adornment of men)… is not appropriate within the professional work setting." This is significant because before 2012, Plaintiff presented as a woman outside of work and presented primarily as a man while at work. Beginning in 2007 or 2008, Hughes began introducing feminine elements to her appearance, such as cosmetics, nail polish, and jewelry. Since 2012, Plaintiff presents as a female both outside of work and at work. In 2010, Plaintiff began wearing eye makeup while at work.

Also, in 2010, Plaintiff began experiencing leukemia-like symptoms. She was diagnosed with immune thrombocytopenic purpura ("ITP"). ITP is an autoimmune disease, affecting the blood system, in which the immune system develops antibodies to as well as destroys its own platelets. A person with ITP is susceptible to life-threatening bleeding or hemorrhaging.

Hughes underwent chemotherapy, a splenectomy, and was hospitalized for about 40 days in order to treat the ITP. In order to receive the treatment, Hughes began a medical leave of absence from WBH and did so under the Family and Medical Leave Act ("FMLA"), on May 3, 2010. She had not been the subject of any disciplinary action at the time that she started her leave.

The WBH FMLA policy states:

If an employee returns from a Family and/or Medical Leave and has exceeded their twelve (12) weeks of job protections within a twelve (12) month period… and the employee's position is no longer available, he/she will be placed on an unpaid 60-day layoff and must be referred to HR…. If a position is not secured within sixty days, or a

"good faith job offer" is refused, the department manager should terminate the employee through Oracle Manager Self Service indicating "discharged layoff."

On September 2, 2010, WBH notified Hughes that her FMLA leave had expired, and that it planned on posting her ICC position.  On November 1, 2010, Hughes submitted an online request for consideration for an open ICC position; on November 2, 2010, Hughes presented a medical document to WBH that indicated that she was able to return to work.  By this time, Plaintiff had requested to extend her leave four times and had been on leave for six months.[1] Also by this time, her previous ICC position had been filled. As a result, on November 10, 2010, WBH advised Hughes that she would be placed on a 60-day layoff status. If Hughes failed to find another position within WBH's imposed 60-day period, her employment would be terminated, and she would have to apply for WBH jobs as an external candidate.

During the 60-day time period, Hughes could apply as an internal candidate to positions within WBH.  Internal candidates receive preferential treatment for an open position relative to external candidates.  Hughes learned that there was an ICC (also referred to as a "Distribution Clerk") position open in Royal Oak, Michigan, for which she applied through WBH's internal placement system.  Nancy Bonacci ("Bonacci") was the supervisor in charge of interviewing and selecting the candidates who would fill the Distribution Clerk position.  The interview team also included Stanley Avery ("Avery") and Joe Simler ("Simler").  The interview team interviewed six candidates, all of who were Beaumont employees, out of a candidacy pool of 61 then-current Beaumont employees who applied for the position.

Plaintiff was required to interview for this position.  The interview team followed a set of interview questions and scored the interviewees based on five factors: (1) service skills; (2)

---

[1] Plaintiff's doctor extended her leave according to the following dates: (1) From May 26, 2010 to July 1, 2010; (2) From July 1, 2010 to August 14, 2010; (3) From August 14, 2010 to September 15, 2010; (4) From September 15, 2010 to October 22, 2010; (5)  From October 22, 2010 to Nov. 2, 2010.

teamwork/fit with current workgroup; (3) inventory management knowledge; (4) multi-tasking skills; and (5) presentation. Plaintiff scored the highest for "inventory management knowledge" but scored among the lowest for "communication," "multi-tasking," and "presentation." Def.'s Mot. Summ. J. 5, Ex. 16.

At the interview, Plaintiff presented as a man. Hughes was ultimately not selected for this position. WBH reasoned that Hughes was not selected for the position because she did not interview well. The selected candidate was also an internal candidate who previously worked in the laundry/housekeeping department. Plaintiff was unable to obtain a job within the 60-day time period. On January 21, 2011, WBH terminated Hughes and, as a result, she lost her status as a current employee as well as the ability to look for WBH job postings as an internal candidate.

After her termination, Hughes continued to apply for jobs with WBH but was unsuccessful. On August 4, 2011, Hughes filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC").

In January 2012, Hughes applied, was offered, and accepted a job at WBH's Grosse Pointe location as an Emergency Transporter (also referred to as "Patient Transporter"). Before employment begins, Beaumont has a policy that requires all prospective employees to undergo a pre-placement drug screening.[2] On February 2, 2012, WBH rescinded its employment offer for the Emergency Transporter position, prior to Hughes's start date. WBH revoked Hughes's employment because she failed the pre-employment drug screen by testing positive for codeine without providing proof of a prescription. Hughes contends that she was able to obtain medication, which contained codeine, without a prescription, in Canada. Specifically, Plaintiff

---

[2] Because Plaintiff's employment with Beaumont had been terminated, she was considered a prospective employee and was thus required to submit to the drug screening.

admits that she ingested Tylenol with codeine the day before the drug screen, which is available over the counter in Canada, in order to treat a migraine headache.  Plaintiff claims that she neither knew that the Tylenol contained codeine nor that it would cause her to fail the drug screen.

Mary Guerra ("Guerra") contacted Hughes to notify her that she did not pass the drug screen. Guerra is a Nurse Practitioner who works in Occupational Health at Beaumont.  She is responsible for notifying a prospective employee of a positive drug screen. Guerra also makes these calls in order to determine if the prospective employee can produce a legal prescription for the drug for which she tested positive. If the prospective employee can produce a prescription, then the employee is considered to have passed the screening.  Guerra is also responsible for notifying Human Resources of both a positive and negative drug screen. If the prospective employee fails the drug screen, Guerra does not tell Human Resources why the prospective employee did not pass.

After the EEOC's investigation, the agency found that there was reason to believe that WBH violated Title VII based on gender and the American Disabilities Act.  On June 3, 2013, the EEOC issued a "Right to Sue" letter.  Hughes filed this suit within 90 after the EEOC issued the "Notice of the Right to Sue" letter.

## III.    LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241

F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The party seeking summary judgment "bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322.  The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  The evidence presented must be such on which a jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id.* at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial."

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).   Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff requests that the Court grant her Motion for Partial Summary Judgment as it relates to Defendant's liability under the ADA and the Michigan PDCRA.  The primary issue presented here is whether the ADA required WBH either to reinstate Hughes to her prior ICC position or to place her into a comparable position.

Plaintiff argues that WBH discriminated against her as a disabled individual, specifically as a sufferer of ITP, in the following ways: when WBH replaced her during her medical leave of absence; when WBH failed to accommodate her disability; when WBH failed to place her in her former position or a comparable one; and when WBH terminated Hughes on the expiration of her 60-day layoff period. Plaintiff further argues that WBH's leave policy, which effectively terminated Hughes when she was replaced during her medical leave and the subsequent failure to place her into a vacant positions, is a *per se* violation of the ADA.  Defendant contends that ITP is not a condition protected under either the ADA or the PDCRA.

Both Parties contend that they are entitled to a ruling as a matter of law that ITP is or is not a disability, respectively, under the ADA.  Within this section, the Court will address both Plaintiff and Defendant's Motions in tandem.

### 1. Reasonable Accommodations and Discrimination Under the Americans with Disabilities Act (Count I)

In order to be granted relief, the Plaintiff must first satisfy several inquiries as a threshold matter. The first question is to determine whether Plaintiff's condition is, in fact, a disability under the ADA. The Act states:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

To defeat a motion for summary judgment, the employee has to establish a prima facie case of discrimination by proving that: (1) she is an individual with a disability; (2) she is "otherwise qualified" to perform the job requirements, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replace. *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.2d 775, 779 (6th Cir. 1998) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173 (6th Cir. 1996)).

### a. *Plaintiff's ITP is a disability as defined by the ADA.*

The first question presented is whether Plaintiff has a disability as defined under the Act. Under the ADA, the term "disability" is defined as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

"Major life activities" are defined, under the Act, as:

> (A) In general, [f]or purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> (B) Major bodily functions [are f]or purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

42 U.S.C. § 12102(2).

An individual is regarded as having an "impairment" under paragraph (1)(C), as stated above, if:

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3).

The statute also contemplates rules of construction. The Act states, in part:

> The definition of "disability" in paragraph (1) shall be construed in accordance with the following:
> (A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.
> (B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.
> (C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.
> (D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

42 U.S.C. § 12102(4).

Plaintiff argues that ITP is a disability as defined under the Act.  Plaintiff contends that ITP falls under the definition, as stated in 42 U.S.C. § 12102(2)(B), because ITP is a physical impairment that substantially limits a major life activity, which in this case, is the functions of the immune system. To further support its contention, Plaintiff cites *Thomas ex rel. Thomas v. Davidson Academy*. 846 F.Supp. 611 (M.D. Tenn. 1994) (memo).  The court in *Thomas* held that the Plaintiff's ITP was a disability within the meaning of the Act.

The *Thomas* court notes, however, that determinations about whether a person is substantially limited in a major life activity should be made on a case-by-case basis. *Id.* at 617. In the *Thomas* case, the court regularly emphasizes "Miss Thomas' (Plaintiff's) ITP" is a physical impairment and bases its reasoning on a detailed account of her specific medical history and records. *Id.* at 617-18.  Therefore, *Thomas* does not necessarily hold that ITP is a disability, as a blanket matter.  Instead, it stands for the proposition that an ITP diagnosis should be evaluated to determine the extent that it is a physical impairment for the Plaintiff in order to determine whether it is indeed a disability under the Act.  Therefore, Hughes is not entitled to summary judgment on this count as a matter of law merely because she has been diagnosed with ITP.

 A plaintiff who alleges that she was the recipient of discrimination can attempt to establish this by introducing direct evidence of discrimination, including "evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making the adverse employment decision."  *Id.* at 1178 (citations omitted).

Defendant contends that ITP is not a disability as defined by the ADA. Defendant points to *Toyota Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), as support that Plaintiff has not properly demonstrated her disability claim. *Williams* found that it is insufficient to merely proffer evidence of a diagnosis in an attempt to prove the existence of a disability. *Id.* at 198. *Williams* further found that the ADA requires that the plaintiff offer evidence of the extent to which the limitation caused by a physical impairment in terms of their own life experience, and that the Act contemplates the term disability with respect to an individual. *Id.*

It is important to note that the ADA Amendments Act of 2008, U.S. Pub.L. 110-325 (2009) expressly overturned the Supreme Court's holding in *Williams* – that substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives, and that the impairment's impact must also be permanent or long term. In regard to the ADA's purpose, the ADA Amendments Act states, in part:

(1) [T]o carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;…

(4) [T]o reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives"; [and]

(5) [T]o convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to

convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis[.]

In this case, the Court finds, as a matter of law, that Plaintiff's ITP is a disability. Both the ADA statute and its amendments emphasize that the term "disability" be construed broadly. Plaintiff has proffered evidence that the ITP has substantially limited her performance of a major life activity, which has included limiting the way the nervous system functions, her recorded hospitalization, and the time that she took away from work as mandated by her doctor.

> **b. *There exists a genuine issue of material fact as to whether Defendant is qualified with a reasonable accommodation under the ADA.***

The reasonable accommodations provision of the ADA includes:

(A)     [N]ot making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B)     [D]enying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant; [and]

(C)     [U]sing qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]

42 U.S.C. § 12112(b)(5).

Section 12111(9) of the ADA further defines "reasonable accommodations" to include:

(A)     Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B)     Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training

materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

A plaintiff must establish both that a reasonable accommodation is possible and also that she is qualified for the position with such reasonable accommodation. *Cehrs*, 155 F.3d at 781 (citation omitted). "[T]he plaintiff must merely 'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *Id.* (citation omitted).

Defendant contends that Plaintiff only asked for Beaumont Hospital to extend her leave time. Upon her expected November return date, however, Plaintiff showed up for work. It can be interpreted from this circumstance and the fact that Plaintiff applied to a vacant position similar to, if not identical to, her prior position, that Plaintiff was requesting job placement. If this is the case, then Plaintiff has satisfied her burden because the Act expressly states that "job restructuring" and "reassignment to a vacant position" are reasonable accommodations. In addition, "[w]here the request accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities." *Kleiber*, 485 F.3d at 870.

For this reason, Plaintiff argues that Defendant violated this provision when it did not place Hughes into a vacant position within the hospital system when she returned from leave. Plaintiff further asserts that not only did Defendant not assign Hughes to the position for which she was interviewed and qualified for, but that 17 other vacancies were available, including Plaintiff's prior position becoming vacant. At no point did Defendant place Plaintiff into one of those positions.

Defendant argues, seemingly in the alternative, that it was under no obligation to place Hughes into a vacant position within the employment system and that the only accommodations that Plaintiff requested were extensions of leave. Defendant specifically contends that Plaintiff

lost her "qualified" status under the Act when she could not identify when she could return to work.

This Court is not persuaded by the authority provided by Defendant, which is not binding on this Court, to justify its argument that Plaintiff's extensions of leave made her leave indefinite and thus disqualifies her for "qualified" status under the ADA. This Court will instead rely on Supreme Court and Sixth Circuit precedent.

The Supreme Court has found that the determination of whether an individual is qualified under the Act deserves individualized attention. *See Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287. In other words, in order to determine the question of whether a person with a disability is qualified, "'the district court will need to conduct an individualized inquiry and make appropriate findings of fact.'" *Cehrs*, 155 F.3d at 782 (citing *Arline*, 480 U.S. at 287). The Sixth Circuit has noted that "[i]f we were to presume that uninterrupted attendance in all instances is a mandatory job requirement, then the policies and needs of both the individual employer and employee would never be considered... Prohibiting employees with disabilities from taking a leave of absence as a reasonable accommodation, while allowing other employees to take advantage of the employer's leave policies, would result in employees with disabilities being treated differently and worse than other employees." *Id.* at 782-83. The *Cehrs* court held that, in the Sixth Circuit, there is no presumption "that uninterrupted attendance is an essential job requirement, and find that a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances." *Id.* at 273. Whether Plaintiff's request for extended leave, beyond the time mandated by the FMLA,[3] was reasonable is a question of fact. Thus, there exists a genuine issue of material fact on this question that would be properly decided by a jury.

---

[3] The FMLA entitles employees to 12 workweeks of leave during any 12-month period due to a serious medical condition, which makes the employee unable to work. 29 U.S.C. § 2612(a)(1).

Defendant further contends that it was not its obligation to "bypass[] its legitimate 60-day layoff policy or leapfrog[] Plaintiff over the 60 other Beaumont employees applying for the ICC Job." Def.'s Reply 2. The Sixth Circuit has found:

> "[A]n employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000). However, this duty does not require employers to "create new jobs [or] displace existing employees from their positions … in order to accommodate a disabled individual." *Id.*

*Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

That is not the case here. It does not appear that Plaintiff was requesting that she be "leapfrogged" over existing candidates. It is the Court's understanding that Plaintiff was requesting that she be leapfrogged over *potential* employees for vacant positions. Requesting this accommodation is within the scope of the Act. The issue here is whether, at this point, Plaintiff was considered to be a Beaumont Hospital employee. While Plaintiff was in a 60-day layoff status, she was also considered an internal candidate for purposes of job applications. A jury will have to determine, based on the facts, if Plaintiff was effectively an employee.

The burden from here then shifts to Defendant to demonstrate that "the accommodation is unreasonable and imposes an 'undue hardship' on the employer." *Cehrs*, 155 F.3d at 781 (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 n.12 (6th Cir. 1996)). In determining whether a reasonable accommodation presents an undue hardship, courts should consider:

    i.      [T]he nature and cost of the accommodation needed;

    ii.     [T]he overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

    iii.    [T]he overall financial resources of the covered entity; the overall size of the business with respect to the number of its employees; the number, type, and location of its facilities; and

      iv.     The type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10)(B). To prove "undue hardship," WBH has to show "both that the hardship caused by the proposed accommodation would be undue in light of the enumerated factors, and that the proposed accommodation is unreasonable and need not be made." *Cehrs*, 155 F.*3d* at 782 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (6th Cir. 1995)).

WBH has not made such a showing. WBH justifies its termination of Hughes, generally, by stating that it was under no obligation to place Plaintiff into a vacant position pursuant to its 60-day layoff policy. If WBH were to make a proper showing that it would suffer an undue hardship, then the burden shifts back to Hughes to demonstrate that WBH's demonstration was merely a pretext. Plaintiff can demonstrate pretext by "offering evidence that the employer's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee." *Id.* (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996)). Plaintiff has also not made this showing.

### 2. Reasonable Accommodations and Retaliation Under the Michigan Persons with Disabilities Civil Rights Act (Counts II & V)

#### *a. There exists a genuine issue of material fact as to whether Defendant was provided a reasonable accommodation under the PDCRA (Count II).*

The Michigan PDCRA states:

      A person shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation would impose an undue hardship.

Under the PDCRA, an employer shall not:

-17-

(a) Fail or refuse to hire, recruit, or promote an individual because of a disability… that is unrelated to the individual's ability to perform the duties of a particular job or position.

(b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability… that is unrelated to the individual's ability to perform the duties of a particular job or position.

(c) Limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive an individual of employment opportunities or otherwise adversely affects the status of an employee because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position.

(d) Fail or refuse to hire, recruit, or promote an individual on the basis of physical or mental examination that are not directly related to the requirements of the specific job.

(e) Discharge or take other disciplinary action against an individual on the basis of physical or mental examinations that are not directly related to the requirements of the specific job.

MICH. COMP. LAW ANN. § 37.1202(1).

The ADA and the PDCRA utilize the same statutory framework, except for in retaliation cases. For this reason, the courts have applied the Michigan PDCRA in the same manner as the ADA. *Chavez v. Waterford Sch. Dist.*, 720 F.Supp.2d 845, 854 (E.D. Mich. 2010) (citing *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002)) ("The Sixth Circuit has held that the ADA and PWDCRA "substantially mirror" each other. Therefore resolving the ADA claim will generally resolve the PWDCRA claim as well."). With this being the case, the Court does not have to engage in the same inquiry. There exists a genuine issue of material fact, for which a jury should decide.

> **b. There exists a genuine issue of material fact as to whether Defendant retaliated against Plaintiff under the PDCRA (Count V).**

The PDCRA also states that a person shall not do the following:

Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing *under this act*.

MICH. COMP. LAW ANN. § 37.1602(a) (italics added).

> To establish a prima facie case under the PDCRA, a plaintiff must establish:
>
> > (1) that she engaged in a protected activity;
> > (2) that this was known by the defendant;
> > (3) that the defendant took an action adverse to the plaintiff; and
> > (4) that there was a causal connection between the protected activity and the adverse action.

*Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 437 (Mich. Ct. App. 2002).

"A causal connection for purposes of establishing a prima facie case of retaliation can be shown 'through knowledge [of the charge] coupled with a closeness in time that creates an inference of causation." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) (citation omitted).

Defendant simply argues that the employer did not know that Plaintiff had engaged in a protected activity – filing an EEOC charge. Defendant further points out that the employees that made decisions about Plaintiffs employment were not aware of Plaintiff's pending EEOC charge. Plaintiff contends that officials in the human resources department were aware of Plaintiff's pending charge. In addition Plaintiff suggests that her job offer at the Grosse Pointe location was revoked shortly after charges were filed.

Based on these arguments and the appropriate supporting materials, a genuine issue of material fact exists here for which a reasonable jury could decide in favor of either Party.

### C.  Defendant's Motion for Summary Judgment

The main issue is whether there is a genuine issue of material fact as to the remainder of Plaintiff's claims: Title VII of the Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act. Defendant, WBH, argues that it is entitled to summary judgment on the following legal issues because it has not violated any of the laws through which Plaintiff seeks relief.

Specifically, WBH contends that it has never even made mention of Plaintiff's transition in appearance or discriminated against Plaintiff for that reason.

Plaintiff, Hughes, argues that Defendant's past remarks about her makeup, dress, and overall appearance, particularly during a job interview, support the contention that she has a strong basis for relief under Title VII and Michigan's ELCRA.   This Court will DENY Defendant's Motion for Summary Judgment.

### 1.  Gender Discrimination Under Title VII of the Civil Rights Act of 1964 (Count III)

Title VII states:

> It shall be an unlawful employment practice for an employer--
>
> (1)     [T]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2)     [T]o limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Plaintiff claims that she was treated disparately for failing to conform to male stereotypes.  "The disparate treatment doctrine, articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), requires a plaintiff to demonstrate that an employer has treated some people less favorably than others because of their race, color, religion, sex or national origin."  *Dunlap v. Tennessee Valley Auth.*, 519 F.3d 626, 630 (6th Cir. 2008).

To prove a sex discrimination case on a disparate impact theory, a plaintiff must first demonstrate the following prima facie case, that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; and (3) she was treated differently than comparable

employees outside of the protected class. *Id.* (citations omitted). Disparate treatment due to a person's failure to conform to male stereotypes is cognizable under Title VII's prohibition of sex discrimination. *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004).

To rebut a prima facie disparate treatment case, a Defendant must articulate a legitimate nondiscriminatory reason for the plaintiff's rejection. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981)). The burden then shifts back to Hughes to demonstrate that the explanation offered by WBH is pretext for discrimination. *Harrison v. Metro. Gov't of Nashville and Davison Cnty.*, 80 F.3d 1107, 115 (6th Cir. 1996). The purpose of this factual inquiry is to determine whether a defendant intentionally discriminated against the plaintiff. *Dunlap*, 519 F.3d at 630. The Sixth Circuit has stated that in Title VII cases a "plaintiff has the burden of establishing a *prima facie* case of discrimination 'either by direct evidence or circumstantial evidence.'" *Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 164 (6th Cir. 2004) (citing *Shepard v. Griffin Servs., Inc.,* No. 19032, 2002 WL 940110, at *3 (Ohio Ct. App. May 10, 2002), quoting *Teamsters v. United States,* 431 U.S. 324, 357–58 (1977)).[4] In some cases, disparate treatment can be inferred from the mere fact of differences in treatment. *Dunlap*, 519

---

[4] The Sixth Circuit distinguishes direct and circumstantial evidence as follows:

> Direct evidence is 'evidence which, if believed, proves the existence of improper discrimination animus without inference or presumption.' Evidence either of statements made by non-decision makers or of statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden of demonstrating direct evidence of discriminatory animus. Instead, a plaintiff must show a direct correlation between the evidence of discrimination and the specific employment decision in question.

*Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 164-65 (6th Cir. 2004).

Circumstantial evidence can also be used to prove discriminatory intent in disparate treatment cases. *See Grano v. Dep't of Dev. of City of Columbus*, 637 F.2d 1073, 1081 (6th Cir. 1980) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-266) (holding that "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."). Nonetheless, "under the disparate treatment theory, the plaintiff must prove discriminatory intent." *Grano*, 637 F.2d at 1081 (citing *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 575 (1978)).

F.3d at 630 (citing *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92 (6th Cir. 1982)).

"The burden of establish a prima facie case of disparate treatment is not onerous." *Id.* (citing *Burdine*, 450 U.S. at 253). Plaintiff was a transgender individual, who was qualified for the position as evidenced by the fact that she once held the position for 30 years, and a non-transgendered male was hired for the position. In regard to being treated differently, Plaintiff contends that she was repeatedly passed over for positions in favor of less qualified candidates. She supports her contention with testimony that the person who received the position in which she interviewed was required to undertake a month-long training course. In addition, Plaintiff points to comments made in her re-hiring interview referring to her velvet jacket and "messy ponytail," for which she was consequently marked down on her interview reporting sheet. Hughes also points to Chapedelaine's testimony in which she admitted that there were situations where people were uncomfortable with a man acting as a woman, and that it might influence her decision-making.

Defendant contends that Plaintiff's prima facie case for gender discrimination fails on the "different treatment" prong. To support its argument, Defendant points to *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341 (6th Cir. 2005), in which the court found that, "Title VII was not meant to create a 'general civility code.'"  In further support of its contention, Defendant argues that mention of the Plaintiff's velvet jacket and messy ponytail were neutral remarks in response to Plaintiff's disheveled appearance. Defendant also points to the fact that "presentation" was a category on its interviewing rubric.

As a second matter, WBH must put forth a legitimate non-discriminatory reason for (1) not placing Hughes into the position for which she was qualified and interviewed for, and (2)

revoking her offer at Beaumont Hospital's Grosse Pointe location.  WBH has explained that it did not place Hughes in the vacant position for which she applied because she did not score the highest out of the six candidates interviewed. This explanation is sufficient under *Dunlap*.  *Id.* WBH has also explained that it revoked Hughes's offer at the Grosse Pointe location because she tested positive for codeine and thereby failed her pre-employment drug screen. Testing negative in this drug screen is a prerequisite for employment.

As a final matter, plaintiff must show that the justification proffered by Defendant was a pretext for discrimination.  Again, Plaintiff points to comments made in her re-hiring interview referring to her velvet jacket and "messy ponytail," for which she was consequently marked down on her interview reporting sheet. Hughes also points to Chapedelaine's testimony in which she admitted that there were situations where people were uncomfortable with a man acting as a woman, and that it might influence her decision-making.  Also, Plaintiff mentions that while she scored among the lowest of the six candidates interviewed, she scored highest in the category of "inventory management knowledge," but scored among the lowest in the "presentation" category.  Plaintiff contends that this demonstrates that not only was she among the most qualified for the position but also that Defendant assigned too much weight to her identity as a transgender individual.

As a final point on this matter, Plaintiff points to the fact that Defendant did not give her an opportunity to explain the results of her drug screen.  Plaintiff alleges that the codeine was legally obtained over-the-counter at a Canadian business and also alleges that others have been able to provide an explanation for a positive drug test result. Defendant contends that it is its policy to not allow for explanations of positive drug screen results, and that not permitting Plaintiff to offer an explanation was not a discriminatory decision. In addition, Plaintiff points to

the fact that it allows failed drug screeners to provide proof of a prescription, which Plaintiff did not provide.

The arguments proffered by Defendant and Plaintiff reveal a genuine issue of material fact, for which a jury is best suited to make the determination.

### 2. Gender Discrimination and Retaliation Under the Michigan Elliott-Larsen Civil Rights Act (Counts IV and VI)

#### a. *There exists a genuine issue of material fact as to whether Defendant discriminated against Plaintiff based on gender stereotypes (Count IV).*

The ELCRA states:

(1) An employer shall not do any of the following:
    (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
    (b) Limit, segregate, or classify an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.
    (c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including, but not limited to, a benefit plan or system.
    (d) Treat an individual affected by pregnancy, childbirth, or a related medical condition differently for any employment-related purpose from another individual who is not so affected but similar in ability or inability to work, without regard to the source of any condition affecting the other individual's ability or inability to work…

MICH. COMP. LAW ANN. § 37.1210(1).  The state statutory language is similar to Title VII.  For this reason, the courts have applied the Michigan ELCRA in the same manner as Title VII. The Court is not obligated to engage in the same inquiry; there exists a genuine issue of material fact, for which a jury should decide.

**b. *There exists a genuine issue of material fact as to whether Defendant retaliation against Plaintiff under the ELCRA (Count VI).***

To establish a prima facie case of unlawful retaliation under the ELCRA, a plaintiff must show: (1) that she opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was a significant factor in an adverse employment decision. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (citing *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 1999 (6th Cir. 1986)). The "significant factor" standard requires a showing of more than a causal link. *Id.*

Defendant simply argues that the employer, specifically officials in the human resources department, did not know that Plaintiff had engaged in a protected activity – filing an EEOC charge. To further support its argument, WBH contends that employment decisions were made according to Plaintiff's interview scores and drug test screen. Plaintiff contends that officials in the human resources department were aware of Plaintiff's pending charge. Plaintiff further contends that officials used her job interview and drug test screen as a pretext to terminate her employment, which she claims was primarily driven by EEOC charges known to hospital officials who participated in the interviewing processes.

Based on these arguments and the appropriate supporting materials, a genuine issue of material fact exists here for which a reasonable jury could decide in favor of either Party.

## IV.   CONCLUSION

For the reasons stated above, the Court will DENY Defendant's Motion for Summary Judgment [#22]. The Court will also DENY Plaintiff's Motion for Partial Summary Judgment [#23].

IT IS SO ORDERED.

Dated: October 31, 2014                              /s/Gershwin A Drain
                                                     The Honorable Gershwin A. Drain
                                                     United States District Court Judge